IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

  vs.                                                                                                        No. 15-CR-3224-WJ

SANDRA COOK,

    Defendant.

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO EXCLUDE PURPORTED STATEMENTS FOR**
***MIRANDA* VIOLATION (DOC. 36)**

THIS MATTER comes before the Court following an evidentiary hearing on Defendant's Motion to Exclude Purported Statements for Miranda Violation, filed October 17, 2016 (**Doc. 36**). Having reviewed and considered the parties' pleadings, the evidence presented at the Suppression Hearing and the applicable law, the Court finds that Defendant's motion is not well-taken and, therefore, is DENIED.

**BACKGROUND**

Defendant Sandra Cook ("Defendant" or "Cook") is charged with possession with intent to distribute 500 grams or more of methamphetamine. The evidence in connection with this case was collected as a result of a search executed on June 30, 2015 at 2732 Alcazar Street, NE. Albuquerque, New Mexico. The information for the warrant affidavit came from confidential sources, law enforcement surveillance and law enforcement databases. According to these confidential sources, an individual named "Marti" (recognized by a confidential source as Marti Solano) lived at the Alcazar residence and sold drugs from there. Detective Gerald Koppman, employed with the Bernalillo County Sheriff's Office ("BCSO"), signed the search warrant

affidavit for the Alcazar residence and the warrant was issued by a judge of the Bernalillo County Metropolitan Court. The search revealed evidence of methamphetamine and methamphetamine trafficking, including approximately three kilograms of methamphetamine and over $22,000 in cash. The evidence presented at the Suppression Hearing revealed that Defendant was not the target of the investigation. She just happened to be present when the search warrant was executed.

The Government contends that Defendant was read her *Miranda* rights during the execution of the search warrant at the Alcazar Street residence. Defendant denies that she received a *Miranda* warning prior to statements made about the results of the search, and also denies that she affirmatively waived these rights.

## DISCUSSION

Both Detective Koppman and Defendant testified at the hearing. Certain facts are undisputed in the testimony presented, for instance that Defendant answered the door of the residence when the search was initiated; and that she was prevented from leaving the premises during the search.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), before any custodial interrogation, a defendant must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be provided for him. *U.S. v. Erekson*, 70 F.3d 1153, 1156 n.1 (10th Cir. 1995). *Miranda* only applies when an individual is subject to "custodial interrogation." *U.S. v. Hudson,* 210 F.3d 1184, 1190 (10th Cir. 2000); *Miranda*, 384 U.S. at 444. As to the question of custody, the Supreme Court has held that a person is not in custody for *Miranda* purposes unless his "freedom of action is curtailed to a degree associated with formal

arrest." *Hudson,* 210 F.3d at 1190 (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)) (quotation omitted). Furthermore, *Miranda* 's "in custody" requirement is measured objectively, the proper inquiry being whether a reasonable person "in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest." *Id*. at 442. When a defendant claims that a statement was obtained in violation of *Miranda*, the government has the burden of proving, by a preponderance of the evidence, that a valid waiver was executed. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). In this case, there is no question that Defendant was in custody for purposes of analysis; the sole question is whether Det. Koppman advised Defendant of her rights under *Miranda*.

## I.   Detective Koppman's Testimony[1]

According to Det. Koppman, a search of the downstairs bedroom of the residence revealed, inter alia, half a pound of methamphetamine, an ounce of heroin, a gun, pills, mushrooms, a small amount of marijuana, and a large amount of cash. In the upstairs bedroom, officers found about six pounds of methamphetamine located in a closet as well as a driver's license belonging to Cook. A social security card with Cook's information was also found on a shelf in the upstairs bedroom. Det. Koppman described the upstairs bedroom as looking "like a completely normal person's residence" in that it was clean and "put together." The downstairs bedroom, by comparison "looked something more like we would normally find in a methamphetamine-related search . . . ." There was "stuff everywhere" and "objects on top of objects." Det. Koppman believed that the half pound of methamphetamine and various other

---

[1] The testimony described by the Court can be found in the hearing transcript, Doc. 58 ("TR"). The Court accepts without reservation Det. Koppman's testimony that that he has been involved in the execution of literally hundreds of searches pursuant to judicially approved warrants. As a result, the Court finds that any minor inconsistencies in his recollection of events relating to the search that occurred almost two years ago is, understandably, less than perfect and that none of these inconsistencies are relevant to the question of whether Defendant was provided her *Miranda* rights.

items found in the downstairs bedroom belonged to Marti Solano ("Marti") while the other items found upstairs belonged to Defendant. When Det. Koppman returned downstairs after searching the second floor of the residence, he found Marti as well as another subject present, who stated that he was giving Marti "acupuncture or chiropractic work." Det. Koppman testified that Marti was the target of the investigation, and that he recognized her from booking photos he had seen. TR at 24:17-19.

Det. Koppman spoke with Marti, who told him that the drugs upstairs belonged to Cook, who was her supplier. Det. Koppman then spoke with Cook and is certain that he advised her of her *Miranda* rights, which is something he does in the normal course of interviewing a suspect and when he is executing a search warrant:

> Q. And so do [sic] you go upstairs and speak with Sandra Cook?
> A. Yes.
> Q. When you spoke with her, did you advise her of her *Miranda* rights?
> A. Yes.
> Q. Is that something you do as a part of your normal course every time you interview a suspect and when you are executing a search warrant?
> A. Yes.
> Q. And do you remember doing that?
> A. Yes.
> Q. So you advised her of her right to remain silent?
> A. Yes.
> Q. And anything she said could be used against her?
> A. Yes.
> Q. And that she had a right to an attorney?
> A. Yes.
> Q. And she could have one appointed if she couldn't afford o ne?
> A. Yes, sir.
> Q. And she could exercise her right at any time?
> A. Yes.

TR at 13:13-25; 14:1-7.

Det. Koppman did not recall Defendant either waiving her right to remain silent or invoking her right to an attorney, but remembered that at some point in that conversation after

she was advised of her rights, Defendant denied ownership of the methamphetamine. TR at 14:18-22. While his recollection of the conversation that followed was "spotty," Det. Koppman did recall that Defendant was "playing dumb," "talking in circles" and repeating words to the effect that she did not understand what was going on. He realized at that point that Defendant did not intend to cooperate and so he finished up with the search at the residence, searching and seizing anything that was potentially evidence or cash. TR at 13:9-15:7.

After the search was complete, Det. Koppman drove Defendant to the North Valley substation, making general conversation. He did not recall Defendant making any statements in the car. TR at 16:1-11. Before going to type up the criminal complaint, he suggested to Defendant that it might be in her best interest to cooperate with law enforcement. After preparing the complaint at the substation, Det. Koppman was informed that Defendant wanted to talk to him. He could not recall details, but did recall that Defendant initiated the conversation with him. TR at 17:20-21. Det. Koppman and another deputy sat down with Defendant in a room at the substation, where Defendant admitted that the methamphetamine was hers. She also told the detectives where the drugs came from and who else was involved, providing names that were familiar to Det. Koppman through his investigation of that methamphetamine ring. Defendant was then booked, and released a day later. Det. Koppman testified that he knew of her release because she called him after she got out (he had provided Defendant with his number earlier). In that conversation, Defendant told him she wanted to cooperate on bigger methamphetamine investigations. She and Det. Koppman spoke "multiple times" after that instance. TR at 18:1-12.

Det. Koppman testified that he did not re-*Mirandize* Defendant either in the vehicle on the way to the substation, or at the substation. He also stated that Defendant was out of custody when she called him after her release.

## II.   Defendant Cook's Testimony

Defendant stated that she opened the door to the Alcazar Street residence. She testified that when the doorbell rang and she looked out of the peephole, she saw her fiancé Jeff, who was there to pick her up for her hair appointment, and when she opened the door for him, an individual (Det. Koppman) ran in behind him asking "Where is Marti"? Defendant said that Det. Koppman and another individual who entered the house wore plain clothes, but one of them identified himself as a police officer, saying they were there for Marti. TR at 32:8-12;33:1-14; 40:17-20. Defendant stated that she did not know Det. Koppman was a police officer, since he was in plain clothes. TR at 32:9-18. Defendant recalled that when she tried to leave the house for her appointment with her boyfriend, the house was surrounded by plain clothes officers who told her to go back inside the house. TR at 32:18-25. She stated that she questioned the officers to find out what was going on, and when kept asking what was going on, they told her to sit on the couch. She asked to see a search warrant, but the officers told her that they could not show it to her. TR at 33:1-17.

Defendant's testimony is consistent with that of Det. Koppman in that the officers executing the search prevented her from leaving the house. TR at 33:18-23; 40:21-23. However, in stark contrast to Det. Koppman's testimony, Defendant claimed that she was never read her *Miranda* rights:

Q.   Let's stay focused on the question whether you were read *Miranda* rights.
A.   No, I was not. Never.
Q.   And you are absolutely sure.
A.   Absolutely 100 percent sure that I was never read my rights ever.

TR at 36:1-3. Defendant's recitation of events diverges from Det. Koppman's version in other respects.

A.     . . . [Det. Koppman] went downstairs, and then came back upstairs, and he let everybody leave, and then he said he was taking me to the substation.
Q.     And so you then went with him to the substation.
A.     In his car.
Q.     In his car. Do you remember being read any kind of *Miranda* warning at any point?
A.     No.
Q.     Are you sure that this did not happen?
A.     I'm positive. I didn't understand what was going on, and he never said, "You are under arrest."

TR at 34:9-19. Defendant testified that "it was scary" because she "wasn't sure what was going on." She told Det. Koppman that she wanted to call her attorney but did not give him the name of the attorney. TR at 35:1-9.

Defendant stated that she did not live at the Alcazar Street residence. When Det. Koppman informed her at the substation that he had found methamphetamine in her room along with her ID, she told him that she didn't have an ID, that she did not live at the Alcazar Street residence and that the room in which she stored her "stuff" did not have any methamphetamine in it. TR at 35. However, Cook admitted to Det. Koppman that both the driver's license and social security card found in the upstairs bedroom belonged to her. She also explained that she was subleasing the house to her sister-in-law and to Marti; and that she had spent the night at the residence and was there at the time of the search to evict Marti out of the house, but Marti wouldn't leave. *Id.;* TR at 39:1-3.

Defendant stated that she knew at some point that the individuals who entered the residence were police officers and that they were looking for Marti, but disavowed any awareness that the search could be related to drugs. TR at 41-42. She stated that she was trying to evict Marti because her sister-in-law said that Marti was "doing things," and that "she was

questionable." Defendant suggested that Marti was involved in something illegal ("more of a prostitution"), yet at the same time professed ignorance as to why police would be searching the house. TR at 42:7-43:15.

Defendant testified that Det. Koppman was doing all of the talking during the ride to the substation after her arrest. Once there, she was put in a cell and after a couple of hours, Det. Koppman asked her if she would cooperate with him about Marti. Defendant told Det. Koppman she would tell him whatever he wanted to know. She also told Det. Koppman that she would contact him after she called her lawyer. TR at 44:22-45:1-4.

On cross-examination at the hearing, counsel for the Government elicited testimony from Defendant describing a "conversation" Defendant had with Det. Koppman in which Defendant denied that the methamphetamine and cash were hers and that she was trafficking methamphetamine. TR at 46. It is unclear how these statements fit into the context of Defendant's statements or "confession," but since it has been acknowledged that Defendant made incriminatory statements at some point during her detention (based on the pleadings and indeed, the instant motion), the critical inquiry remains whether Defendant was read her Miranda rights.

### III. Credibility

Defendant filed this motion to exclude her "purported confession" or "any incriminating statements allegedly made by her." Doc. 36 at 1-2. These statements concern Defendant's admissions of ownership to the evidence seized at the Alcazar Street residence, namely the methamphetamine and cash found in the upstairs bedroom. Defendant does not claim that she was read her rights but did not understand them, or that she invoked her right to counsel at any time afterwards. At the hearing, defense counsel emphasized that Defendant's position is "very

simple, that [Defendant] was not Mirandized while under arrest, and that the subsequent questioning by Detective Koppman needs to be suppressed under the rubric of *Miranda*." Because the testimony presented by Det. Koppman and Defendant are contradictory, the resolution of that question requires the Court to engage in a credibility determination, on which the Court ultimately finds in favor of the Government.

As an initial matter, Det. Koppman's testimony at the hearing is consistent with his supplemental report. In that report, Det. Koppman states that Defendant told him she was willing to speak with him and to cooperate, and this also is consistent with Defendant's own testimony.[2] The report states that Defendant initially denied ownership of the methamphetamine and mushrooms but at the substation, just prior to transporting her to the detention center, she told Det. Koppman that the methamphetamine found in her room at the Alcazar Street residence did in fact belong to her, that her suppliers are from the Sinaloa Cartel and that Marti is her main customer. Doc. 44-3. Det. Koppman's report does not mention that Defendant either invoked her right to remain silent or requested an attorney.

At the evidentiary hearing, Det. Koppman acknowledged that his recollection of events was not "100 percent." TR at 8-9. As a result, there are a few inconsistencies in Det. Koppman's testimony which the Court finds are easily attributable to the fact that Det. Koppman has been involved in the execution of literally hundreds of similar searches pursuant to warrants and that the search in question in this case was carried out a year and a half ago. One example of such an inconsistency is Det. Koppman's recollection that Defendant answered the door of the

---

[2] Defendant does not argue that Det. Koppman should have re-read Defendant her rights, since Defendant's position is that she was never advised of those rights. However, the Court notes that the passage of time alone does not invalidate previously given Miranda warnings. *Mitchell v. Gibson*, 262 F.3d 1036, 1057-58 (10th Cir. 2001); *see also Berghuis v. Thompkins*, 560 U.S. 370, 387, 130 S.Ct. 2250 (2010) (noting that courts "have consistently upheld the integrity of Miranda warnings even in cases where 'several hours' have elapsed between the reading of the warning and the interrogation") (citing several circuit decisions).

Alcazar Street residence, which is different from the statement in his supplemental report that he located Defendant in the garage of the residence. Doc. 44-3. However, Defendant's own testimony supports Det. Koppman's testimony that Defendant did answer the door to the residence.

There is also a discrepancy concerning the amount of time that passed at the substation before any conversation took place between Defendant and Det. Koppman. According to Det. Koppman, it was necessary to go to the substation to type up the criminal complaint, which took him 30 to 45 minutes to do, after which he was advised that Defendant wanted to speak with him. TR at 16:14-18. Defendant recalls that she was in the cell a "few hours" before Det. Koppman came to speak with her. TR at 45:8-14. However, it's not clear whether the 45 minute time frame accounts for the entire period of time that was spent at the substation, and so this discrepancy is not worth further consideration because it is not relevant to the central question of whether Defendant was advised of her rights.

Despite these few minor discrepancies, the Court finds the testimony of Det. Koppman to be credible.[3] Defendant's testimony, on the other hand, is riddled with implausibilities, suggesting weakness in its content rather than mere memory lapses. For example, Defendant explained that the identification found in the upstairs bedroom could not be hers because she had "lost" them, yet admitted that the driver's license and social security cards found there were hers. Defendant insisted that on the date of the search on June 30, 2015, she did not live at the Alcazar residence. However, the room in which the officers found the driver's license and social security

---

[3] In a previous motion, the Government sought to limit any cross-examination of Detective Koppman in reference to alleged misrepresentations made in a search warrant affidavit in an unrelated case. The Court granted the motion, finding that cross-examination regarding the unrelated case was not admissible under Rule 608(b), and would also not pass the test for relevance and balancing under Rules 402 and 403 of the Federal Rules of Evidence. Doc. 57. The Court's ruling on this motion takes into account the testimony and evidence presented at the evidentiary hearing on the instant motion.

card was, unlike the disheveled bedroom downstairs belonging to Marti, tidy and orderly—suggesting that someone was actually living there.  Cook also explained that she was there on the day of the search because she had stayed overnight and was there to evict Marti from the house.  The Court finds these explanations to be bit dodgy, namely: Defendant's claim to have lost her identification documents that were found in the same house where she was staying; and going to the Alcazar Street residence for the purpose of evicting Marti, yet staying the night.  In addition, it is far from clear whether Defendant even had the authority to evict anyone from the residence, since Defendant's testimony indicated that she was a leaseholder of the house, and not its landowner or titleholder.  *See* TR at 39:9-22.

Last, Defendant's protestations of confusion during the search are questionable. Defense counsel has stipulated to the fact that Defendant was convicted of a felony in 1989 and that Defendant has been under some form of supervision within the last 10 years.  TR at 49:17-50:3.  The Court also had access to Defendant's Pretrial Services Report, which lists—among other offenses—charges of fraud and forgery in August 1998 (resulting in the issuance of a bench warrant for failure to appear in court on those charges); and receiving or transferring a stolen motor vehicle in July 1998 which was eventually dismissed.  The 1989 felony was a charge for trafficking and conspiracy and a failure to appear, resulting in 60 months imprisonment and 4 years supervised release.  The Court considers this information to be relevant to the issue of Defendant's credibility.  Defendant professed bewilderment at what was happening in the Alcazar Street residence, but her past arrests and convictions would have given her enough familiarity with that part of the criminal legal process to make her state of confusion appear exaggerated.[4]

---

[4] The Court is within its authority to consider this information, since a court may take judicial notice of its own records. *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp. in U.S.A.*, 533 F.2d 510, 521 (10th Cir. 1976). The

Based on the foregoing findings, the Court finds that Det. Koppman's testimony is credible and that the Government has met its burden of showing that Det. Koppman advised Defendant of her *Miranda* rights during the execution of the search warrant at the Alcazar Street residence.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Exclude Purported Statements for Miranda Violation **(Doc. 36)** is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE

---

Court may also consider the information included in the Pretrial Services Report, since there is no "automatic rule" against the reception of hearsay evidence in suppression proceedings, and courts may consider such evidence where it is reliable. *U.S. v. Matlock*, 415 U.S. 164 (1974); *U.S. v. Merritt*, 695 F.2d 1263, 1270 (10th Cir. 1982)(there was no need for the district court to exclude the out-of-court statements from consideration at suppression hearing where the district court had no reason to doubt statements that were inadmissible hearsay had in fact been made, and where there was no indication that the statements were false); *see also, U.S. v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004) (hearsay testimony is admissible at suppression hearings such as the present one and should be considered by a district court in deciding whether an arrest was based on probable cause).